JUDGE CASTEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 13 CV 3904

------------------------------------------------

MWI VETERINARY SUPPLY CO.,                    :

          Plaintiff,                          :

v.                                            :

MERRITT VETERINARY SUPPLIES,                  :
INC., KATHLEEN ROTANZ, and
SARA ST. MARIE,                               :

          Defendants.                         :

---------------------------------------------- x

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff MWI Veterinary Supply Co. (hereinafter "MWI" or "Plaintiff"), by and through

its attorneys, Dechert LLP, brings this action for injunctive relief, compensatory damages, and

punitive damages against Defendants Merritt Veterinary Supplies, Inc. ("Merritt"), Kathleen

Rotanz ("Rotanz"), and Sara St. Marie ("St. Marie" and collectively with Merritt and Rotanz,

"Defendants").

      MWI brings this action to remedy: (1) Merritt's tortious and intentional interference with

MWI's contracts; (2) Defendants' tortious and intentional interference with MWI's customer

relationships; (3) Defendants' unfair competition; (4) Merritt's tortious interference with MWI's

employee relationships; and (5) Rotanz's and St. Marie's willful breaches of their employment

contracts.

## PARTIES

1.     MWI is an Idaho corporation with its corporate headquarters and principal place of

business in Idaho.

2.     Upon information and belief, Defendant Merritt Veterinary Supplies, Inc. is a South

Carolina corporation with its principal place of business in South Carolina.

3.      Upon information and belief, Defendant Kathleen Rotanz is a Florida citizen, residing at 15772 Pentax Avenue, Titusville, Florida 32796.

4.      Upon information and belief, Defendant Sara St. Marie is a Connecticut citizen, residing at 150 Barker Road, Lebanon, Connecticut 06249.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      This Court has personal jurisdiction over Defendants because they all conduct business in New York and the events giving rise to this action have occurred in New York.  *See* N.Y. C.P.L.R. § 302(a)(1).

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in the Southern District of New York.

## FACTUAL ALLEGATIONS

8.      MWI Veterinary Supply Co.'s principal line of business is the distribution of veterinary products to licensed veterinarians.

9.      Among other products, MWI sells pharmaceuticals, vaccines, parasiticides, diagnostics, capital equipment, supplies, veterinary pet food, and nutritional products.  MWI also provides its clients with inventory support and practice management resources.

2

10. The distribution of veterinary products is a competitive business.

11. Defendant Merritt is also engaged in the distribution of veterinary products to licensed veterinarians and is a direct competitor of MWI.

12. Prior to 2013, Prescription Containers Inc., sometimes doing business as PCI Medical Supply ("PCI"), was also engaged in the distribution of veterinary products to licensed veterinarians. PCI operated primarily in the Northeastern United States, with a particular focus on the New York metropolitan area, and was based in Secaucus, New Jersey.

### PCI and Merritt Join Forces

13. In March 2012, PCI partnered with Merritt to form Veterinary Distributors Group, LLC.

14. This partnership allowed these two companies to have a greater market presence outside of the regions of the country in which they were based.

15. As part of this partnership, PCI and Merritt planned to share sales meetings, catalogs, ideas, and solutions.

### MWI Purchases PCI

16. Although MWI conducts business throughout the United States, it is based in Idaho and has a particularly strong presence in the western half of the United States.

17. In December 2012, in an effort to strengthen its business in the Northeastern United States, MWI paid millions of dollars to acquire the assets of PCI. These purchased assets included PCI's proprietary information and customer goodwill.

### The Assets Purchased by MWI from PCI included Restrictive Covenants Signed by PCI Employees, including Rotanz and St. Marie

18.     MWI also purchased most of PCI's contracts as part of the sale.  These purchased

contracts included the Employee Non-Disclosure and Proprietary Rights Agreement

("Agreement") that PCI had entered into with many of its employees, including Rotanz and St.

Marie.  True and correct copies of the Agreements signed by Rotanz and St. Marie are attached

hereto as Exhibits A and B, respectively.

19.     In the Agreement, the PCI employees, including Rotanz and St. Marie, each agreed that

she would not sell competing products to her employer's customers while employed and for

twelve months post-employment:

> Employee further agrees that during the term of this Agreement, and for a period
> of twelve (12) months thereafter, Employee shall not attempt to sell any
> competing goods or services to any client or customer who was a client or
> customer of Employer during the course of Employee's employment with
> Employer, nor shall Employee do any work for or contract with any client or
> customer who was a client or customer of Employer during the course of
> Employee's employment with Employer. Ex. A ¶ 3.1; Ex. B ¶ 3.1.

20.     The employees, including Rotanz and St. Marie, also agreed that they would not solicit,

entice, or persuade any of their employer's employees to terminate their employment.  Ex. A ¶

3.2; Ex. B ¶ 3.2.

21.     The employees, including Rotanz and St. Marie, further agreed that they would not, "for

the duration of this Agreement, nor any time thereafter, without the proper written consent of

Employer, use or disclose any trade secret or confidential information of Employer of [sic] its

clients to its clients or any third parties" and would, upon termination of employment, return all

of her employer's trade secrets and confidential information.  Ex. A ¶¶ 2.3, 2.5; Ex. B ¶¶ 2.3, 2.5.

22.     The employees, including Rotanz and St. Marie, agreed that the covenants "are necessary for the protection of Employer's legitimate business interests and are reasonable in scope and content," "are fair and reasonable considering the scope of Employee's employment, salary and benefits provided by Employer," and "that such restrictions will not unduly restrict or prohibit Employee from obtaining gainful employment in his or her chosen profession." Ex. A ¶¶ 3.3, 5; Ex. B ¶¶ 3.3, 5.

23.     The employees, including Rotanz and St. Marie, agreed that any breach of these restrictions would cause irreparable injury and that the employer would be entitled to an injunction for any breach or threatened breach of these restrictions. Ex. A ¶ 5; Ex. B ¶ 5.

24.     The Agreement inured to the benefit of and is binding upon "Employer and its subsidiaries and affiliates, together with their successors and assigns." Ex. A ¶ 6.1; Ex. B ¶ 6.1.

## Rotanz and St. Marie Cultivate Goodwill as PCI Sales Representatives

25.     Rotanz and St. Marie worked for PCI as inside sales representatives for years. Rotanz began her employment with PCI in September 2006. St. Marie began her employment with PCI in September 2008.

26.     PCI conducted much of its business through its inside and outside sales representatives. Using PCI's resources, Rotanz, St. Marie, and the other PCI sales representatives built goodwill with particular customers over time on behalf of PCI. Rotanz, St. Marie, and other PCI sales representatives were also given access to PCI's confidential information.

27.    As inside sales representatives, Rotanz's and St. Marie's duties included maintaining regular contact with customers, becoming familiar with customers' needs and buying patterns, taking orders, and resolving any potential issues with PCI's customers.

28.    Rotanz and St. Marie would speak with many of their PCI customers several times a week. Rotanz or St. Marie would contact the customers directly or the customers could contact Rotanz or St. Marie directly.

29.    Rotanz and St. Marie worked remotely and telephonically, calling customers in the Northeastern United States from their homes in Florida and Connecticut, respectively. A majority of Rotanz's accounts were in the New York metropolitan area, and many of St. Marie's accounts were also in the New York metropolitan area.

30.    Rotanz and St. Marie had served many of these customers for years on behalf of PCI. As expected in their positions, they used PCI resources to build goodwill with these customers on behalf of PCI. Rotanz and St. Marie became familiar with these customers' preferences, practices, inventory needs, and ordering history so as to best serve these customers on behalf of PCI.

31.    In short, Rotanz and St. Marie were a primary contact for the customers who were assigned to them at PCI.

32.    Upon information and belief, Rotanz and St. Marie also became familiar with many of PCI's customers generally and had access to information regarding these customers while employed by PCI.

6

**Rotanz and St. Marie Accept Employment with MWI and then Abruptly Resign**

33.     When MWI acquired PCI, it offered to employ Rotanz and St. Marie as inside sales representatives.

34.     Rotanz and St. Marie each accepted employment as an inside sales representative for MWI and began their employment with MWI on or about December 31, 2012.

35.     After accepting employment with MWI, Rotanz and St. Marie were given extensive training on MWI's practices and systems.  This training lasted for approximately one month.

36.     Following the training, Rotanz and St. Marie began functioning as full-time inside sales representatives for MWI.  As inside sales representatives for MWI, Rotanz and St. Marie continued managing many of the same accounts they had managed while employed by PCI.

37.     The client relationships that the former PCI sales representatives, such as Rotanz and St. Marie, established with PCI's customers were especially critical to MWI because many of these customers were not existing customers of MWI at all, or placed limited business with MWI. MWI needed time to cultivate these customers' loyalties to MWI to fully realize the benefits of the goodwill that MWI purchased from PCI.

38.     After only a few weeks on the job, Rotanz and St. Marie voluntarily and abruptly resigned their employment from MWI on February 28, 2013, effective at the end of that day. Upon information and belief, Rotanz and St. Marie resigned to accept employment with Merritt and are currently working for Merritt.

39.     In her resignation e-mail, Rotanz touted her success in developing relationships with her customers, writing "I pride myself on forming relationships with my customers." She also emphasized that she preferred "small Mom-and-Pop organizations," like PCI.

40.     MWI conducted exit interviews with Rotanz and St. Marie on February 28, 2013. During those exit interviews, MWI reminded Rotanz and St. Marie of their obligations under the Agreement and specifically read to them their customer and employee non-solicitation obligations under the Agreement. Rotanz stated that she was aware of the confidentiality, non-disclosure, and non-solicitation rules. Similarly, St. Marie stated that she understands the Agreement.

## Merritt Encourages and Induces Rotanz and St. Marie to Blatantly and Systematically Breach the Restrictions in the Agreement

41.     Upon information and belief, since Rotanz and St. Marie have resigned from MWI, Merritt has encouraged and induced Rotanz and St. Marie to regularly call on customers they served for PCI and MWI to divert such customers away from MWI and to Merritt.

### *Rotanz Lures A Customer into Purchasing Products from Merritt without Consent*

42.     By way of example, after commencing employment with Merritt, Rotanz continued to call on a customer she served in New York on behalf of PCI and later MWI ("Customer 1").

43.     Upon information and belief, at no time did Rotanz inform Customer 1 that she was no longer working for MWI but continued to solicit and/or accept orders from Customer 1 as if on behalf of MWI.

8

44.    Upon receiving an invoice from an order, Customer 1 did not understand why the invoice was issued by Merritt rather than MWI.  Customer 1 contacted an MWI sales representative for clarification.  When Customer 1 learned that Rotanz no longer worked for MWI and had placed its order through Merritt without consent, Customer 1 made clear that its desire was to purchase products from MWI.

45.    Upon information and belief, Defendants have continued to service other MWI customers through Merritt without informing, or obtaining consent from, such customers that the orders were being placed with Merritt rather than MWI.

*Rotanz and St. Marie Solicit other Customers they Served while at PCI*

46.    Upon information and belief, Rotanz has also solicited and/or accepted business on behalf of another customer in New York whom Rotanz served on behalf of PCI and continued to serve at MWI ("Customer 2").  Merritt, through Rotanz, sold many items to Customer 2 at the same price that MWI sold these items to Customer 2, while pricing certain items slightly lower than the prices charged to this customer by MWI.

47.    MWI's sales to Customer 2 decreased by greater than 50% in April 2013 and May 2013. When MWI inquired as to the reason, Customer 2 explained that they had placed an order with Merritt, through Rotanz.  When MWI inquired why Customer 2 chose to purchase the similarly priced items from Merritt rather than MWI, the Customer 2 contact responded that he ordered these additional items from Merritt because he was "already on the phone" with Rotanz.

48.    Upon information and belief, Rotanz has also solicited and accepted business on behalf of Merritt from another New York client she served on behalf of PCI and continued to serve at

MWI ("Customer 3"). Customer 3 informed an MWI sales representative that Rotanz had been relentlessly sending emails soliciting Customer 3's business.

49.    MWI has received similar reports that Merritt, through both Rotanz and St. Marie, has solicited and/or accepted business from at least eighteen additional accounts, all but one of which are located in New York.

50.    Each of the accounts referenced in the immediately preceding paragraph were served by Rotanz or St. Marie at PCI. Rotanz and St. Marie also made sales to the vast majority of these accounts during the few weeks they were employed at MWI.

51.    Upon information and belief, Merritt encouraged and induced Rotanz and St. Marie to solicit and accept orders from the above-mentioned PCI customers.

**Merritt was Aware of Rotanz's and St. Marie's Contractual Obligations**

52.    Merritt was aware of Rotanz's and St. Marie's contractual obligations to MWI under the Agreement, including the customer non-solicitation obligation.

53.    On March 25, 2013, MWI, through counsel, sent a letter to Merritt, informing Merritt of Rotanz's and St. Marie's contractual obligations under the Agreement. A true and correct copy of this letter is attached hereto as Exhibit C.

54.    The letter to Merritt specifically quoted the employee and customer non-solicitation provisions of the Agreement. MWI further demanded prompt assurances that, among other things, Merritt would not interfere with Rotanz's and St. Marie's contractual obligations.

10.

55.    On April 5, 2013, Merritt responded through counsel, stating that MWI's demanded written assurances are "inappropriate." Merritt did not represent that it intended to honor the Agreement's restrictions or that it would instruct Rotanz and St. Marie to do so. A true and correct copy of Merritt's response is attached hereto as Exhibit D.

56.    Also on March 25, 2013, MWI, through counsel, sent letters to Rotanz and St. Marie, demanding written assurances that they intended to comply with the restrictions they agreed to in the Agreement. True and correct copies of these letters are attached hereto as Exhibits E and F, respectively.

57.    Merritt was copied on the March 25, 2013, letters to Rotanz and St. Marie.

58.    Rotanz and St. Marie have not provided the assurances requested or otherwise responded to these letters.

### Merritt Pursues PCI's and MWI's Employees

59.    Upon information and belief, Merritt's hiring of Rotanz and St. Marie were only part of Merritt's ongoing campaign to hire away numerous PCI and MWI employees and damage MWI's business following its acquisition of PCI's assets.

60.    Upon information and belief, Merritt has hired at least six former PCI employees who were employed or engaged by MWI following the acquisition, as well as other PCI employees who did not come to work for MWI following MWI's acquisition of PCI.

61.    By way of example, Merritt hired at least one former PCI sales representative who signed an agreement at PCI containing the same or substantially similar non-solicitation and

confidentiality obligations as the agreement signed by Rotanz and St. Marie.  Upon information and belief, Merritt has taken no steps to ensure that this former PCI employee abides by her contractual obligations.

62.    Shortly after agreeing to work for MWI, on February 28, 2013, Rotanz and St. Marie voluntarily resigned from their positions at MWI.

63.    Upon information and belief, Rotanz and St. Marie resigned to accept employment with Merritt.

64.    By way of further example, Clay Cass had been PCI's sales manager before it was acquired by MWI.  Following the acquisition, Cass was retained by MWI as a Business Development Manager in the North Atlantic region.

65.    On or about May 13, 2013, Clay Cass resigned from his position at MWI.

66.    Upon information and belief, Clay Cass was solicited by Merritt to accept employment with Merritt, and was offered a substantial increase in compensation if he would leave MWI.

67.    Upon information and belief, Merritt continues to target MWI's sales force for hiring.

68.    Upon information and belief, following its raiding of PCI's (now MWI's) workforce, Merritt is planning to open a distribution center in East Rutherford, New Jersey.  This distribution center will be located a short distance away from the Secaucus, New Jersey location formerly owned by PCI and now owned by MWI.

## COUNT ONE—TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONSHIPS
### (as to Merritt)

69.   MWI incorporates and realleges the foregoing allegations as if fully set forth herein.

70.   The Employee Non-Disclosure and Proprietary Rights Agreement, signed by each of Rotanz and St. Marie, is valid and enforceable with respect to Rotanz and St. Marie.

71.   Merritt was aware of the existence of the Agreement and its restrictions.

72.   Merritt participated in, encouraged, and/or procured Rotanz's and St. Marie's breaches of the Agreement, including the customer non-solicitation provision.

73.   Merritt's conduct proximately causes and will cause damage to MWI.

74.   Merritt's tortious conduct has caused and will continue to cause irreparable harm to MWI for which there is no remedy at law.

75.   Merritt's tortious conduct entitles MWI to injunctive relief, compensatory damages, and punitive damages against Merritt.

## COUNT TWO—TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONSHIPS
### (as to all Defendants)

76.   MWI incorporates and realleges the foregoing allegations as if fully set forth herein.

77.   As part of its acquisition of PCI, MWI purchased PCI's customer goodwill and worked to build on these business relationships. MWI continued to serve the former PCI customers following the acquisition.

13

78.     Merritt was aware that MWI purchased the assets of PCI, including its customer goodwill, and continued to serve these customers after the acquisition.

79.     Immediately after completing the acquisition, Merritt launched a campaign to usurp the goodwill that MWI purchased from PCI, and divert the former PCI customers to Merritt, through improper, dishonest, and unfair means.

80.     By way of example, Merritt hired former PCI and MWI employees, such as Rotanz and St. Marie, and intentionally encouraged and induced them to breach the restrictions in the Agreement or similar agreements, each of which is valid and enforceable.

81.     By way of further example, Merritt encouraged or induced Rotanz to deceive at least one existing MWI customer by soliciting and/or accepting orders from that customer without disclosing that Rotanz no longer worked for MWI, allowing the customer to believe that it was placing an order with MWI.

82.     In the alternative, upon information and belief, Merritt interfered with the customer relationships and goodwill that MWI purchased from PCI to harm MWI and injure its business.

83.     Like Merritt, Rotanz and St. Marie were and are aware that MWI purchased PCI's customer relationships and continued to serve the former PCI customers following the acquisition. Merritt and St. Marie intentionally interfered with these customer relationships through improper, dishonest, and unfair means, including by breaching the valid and enforceable non-solicitation restrictions in the Agreement and, in Rotanz's case, soliciting and/or accepting orders from an MWI customer without disclosing that Rotanz no longer worked for MWI, allowing the customer to believe that it was placing an order with MWI. In the alternative, upon

information and belief, Rotanz and St. Marie interfered with the customer relationships to harm MWI and injure its business.

84.    As a direct, proximate, and reasonably foreseeable result of Defendants' conduct, MWI has suffered and will continue to suffer damages.

85.    Defendants' tortious conduct has caused and will continue to cause irreparable harm to MWI for which there is no remedy at law.

86.    Defendants' tortious conduct entitles MWI to injunctive relief, compensatory damages, and punitive damages against Defendants.

## COUNT THREE—UNFAIR COMPETITITON
### (as to all Defendants)

87.    MWI incorporates and realleges the foregoing allegations as if fully set forth herein.

88.    Defendants have unfairly competed with MWI by seeking to divert to themselves the goodwill that MWI acquired from PCI at the cost of millions of dollars.

89.    Defendants' improper conduct includes using confidential information that had been developed at PCI as to customers' preferences, buying habits, and special needs.

90.    Defendants' improper conduct also includes deceiving at least one MWI client to believe it was dealing with MWI when it was actually dealing with Merritt.

91.    Defendants' wrongful actions have resulted in the diversion of MWI's customers and business to Defendants.

92.    As a direct, proximate, and reasonably foreseeable result of Defendants' wrongful conduct, MWI has suffered and will continue to suffer damages.

93.    Defendants' wrongful conduct has caused and will continue to cause irreparable harm to MWI for which there is no remedy at law.

94.    Defendants' wrongful conduct entitles MWI to injunctive relief, compensatory damages, and punitive damages against Defendants.

## COUNT FOUR—TORTIOUS INTERFERENCE WITH EMPLOYEE RELATIONS
### (as to Merritt)

95.    MWI incorporates and realleges the foregoing allegations as if fully set forth herein.

96.    Merritt has engaged and continues to engage in a pattern of raiding PCI's and MWI's employees.  The actions of Merritt are not privileged and, upon information and belief, have been taken to harm MWI and injure its business or through improper means.

97.    As a direct, proximate, and reasonably foreseeable result of Merritt's wrongful conduct, MWI has suffered and will continue to suffer damages.

98.    Merritt's breaches have caused and will continue to cause irreparable harm to MWI for which there is no adequate remedy at law.

99.    Merritt's breaches entitle MWI to injunctive relief, compensatory damages, and punitive damages against Merritt.

## COUNT FIVE—BREACH OF CONTRACT
### (as to Rotanz and St. Marie)

100.    MWI incorporates and realleges the foregoing allegations as if fully set forth herein.

16

101.    The Employee Non-Disclosure and Proprietary Rights Agreement, signed by each of Rotanz and St. Marie, is valid and enforceable with respect to Rotanz and St. Marie.

102.    As agreed by Rotanz and St. Marie, the Agreement's restrictions are reasonable and necessary to protect MWI's legitimate business interests.

103.    Rotanz and St. Marie have breached and continue to breach the Agreement, including by soliciting and accepting orders for Merritt from the customers they served on behalf of PCI (and later MWI).

104.    As a result of these breaches, MWI has suffered and will continue to suffer damages.

105.    Rotanz's and St. Marie's breaches have caused and will continue to cause MWI irreparable harm, for which there is no adequate remedy at law.

106.    Rotanz's and St. Marie's breaches entitle MWI to injunctive relief, compensatory damages, and punitive damages.

## DEMAND FOR TRIAL BY JURY

107.    MWI respectfully demands that this proceeding be tried by a jury.

## RELIEF REQUESTED

Wherefore, Plaintiff MWI seeks judgment in its favor and against Defendants Merritt, Rotanz, and St. Marie:

(a)     Awarding compensatory and punitive damages;

17

(b)     Preliminarily and then permanently enjoining Defendants from further violation of the Agreement and from committing other wrongdoing alleged herein; and

(c)     Awarding such other and further relief as the Court deems just and proper.

Dated: New York, New York
       June 7, 2013

                                        DECHERT LLP

                                        By: _Nicolle L. Jacoby_
                                            Nicolle L. Jacoby
                                            Dechert LLP
                                            1095 Avenue of the Americas
                                            New York, New York 10036
                                            Tel.: (212) 698-3500
                                            Fax: (212) 698-3599
                                            Nicolle.Jacoby@dechert.com

                                        *Attorneys for Plaintiff MWI Veterinary Supply Co.*

## <u>VERIFICATION</u>

I, Frank Banesse, under penalty of perjury, hereby certify that I am the North

Atlantic Regional Sales Manager of Plaintiff, MWI Veterinary Supply Co., and that the

statements made in the foregoing Verified Complaint are true and correct to the best of my

knowledge, information, and belief.

*Frank Banesse*

Frank Banesse

EXHIBIT A

3.1.3

PCI MEDICAL SUPPLY

EMPLOYEE NON-DISCLOSURE AND
PROPRIETARY RIGHTS AGREEMENT

In consideration of employment with PCI Medical Supply, located at 120 Apollo Street, Brooklyn, New York 11222, (hereinafter referred to as "Employer"), the undersigned Employee Kathleen E. Royanz , hereby covenants and agrees as follows:

1. Avoidance of Conflict of Interest. While employed by Employer, Employee will not engage in any other business activity which conflicts with Employee's duties to Employer. Under no circumstances will Employee work for any competitor or have any financial interest in any competitor of Employer; provided, however, that this Agreement does not prohibit investment of a reasonable part of Employee's assets in the stock or securities of any competitor whose stock or securities are publicly traded.

2. Confidentiality.

2.1 Employee recognizes and acknowledged that the systems and software which Employer owns, plans or develops, or acquires from third parties, whether for its own use or for use by its clients, are developed as a result of an expenditure of time and expense, are confidential in nature and are the trade secrets, proprietary to and the property of the Employer. Employee further recognizes and acknowledges that in order to enable Employer to perform services for its clients, such clients may furnish to Employer confidential information concerning their business affairs, property, methods of operation or other data and that the good will afforded to Employer depends upon, among other things, Employer and its Employees keeping such services and information confidential.

2.2 For the purposes of this Agreement, a "Trade Secret" is any scientific or technical information, design, process, procedure, formula or improvement that is valuable and not generally known to competitors of Employer including but not limited to computer software programs. Examples are the specialized information and technology relating to Employer's business. "Confidential Information" is any data or information, other than Trade Secrets, that is competitively sensitive, and not generally known to the public, including but not limited to Employer's customer lists, prospect list, suppliers list, trading manuals, product development plans, pricing information, marketing strategies, catalog designs, packaging designs, rebate information with vendors, and internal performance statistics.

2.3 Employee shall not, for the duration of this Agreement, nor any time thereafter, without the proper written consent of Employer, use or disclose any trade secret or confidential

IManage:1423005.1

information of Employer of its clients to its clients or any third parties, or permit or cause any personal organization:

    (a) to copy or duplicate any physical form of Employer's trade secrets or confidential information to or from any medium except for archival, security or other regular business purposes; or

    (b) create or recreate, or attempt to create or recreate, the source programs, object code or any other aspect of the trade secrets of confidential information of Employer, in all or in part; or

    (c) to place such trade secrets into the public domain.

    2.4 Employee shall limit access to all media containing Employer's and or its client's trade secrets or confidential information to its employees and agents necessary to permit Employee to perform tasks required pursuant to the Agreement. Employee further agrees to store all media and documentation upon which Employer's and or its clients' trade secrets and confidential information are recorded in a secure place, except when being used, and will exercise all other reasonable precautions to prevent unauthorized access, whether direct or indirect. Employee agrees that he/she shall not disclose, transfer, use, copy or allow any such trade secrets of confidential information to any employees or third parties.

    2.5 Upon the request of Employer and, in any event, upon the termination of Employee's employment, Employee will leave with the Employer and/or its clients all computer programs, documentation, code, memoranda, notes, records, drawings, manuals, flow charts, or other documents pertaining to Employer's business or Employee's employment (including all copies thereof). Employee will also leave with Employer and or its client's all materials involving any Trade Secrets of Confidential Information of Employer or Employer's clients.

    2.6 During the course of employment, Employee agrees to treat all Trade Secrets and Confidential Information of Employer and its clients as confidential and to take all necessary precautions against disclosure of such information to third parties during and after the terms of this Agreement.

    3. Restrictions on Solicitation.

    3.1 Employee further agrees that during the term of this Agreement, and for a period of twelve (12) months thereafter, Employee shall not attempt to sell any competing goods or services to any client or customer who was a client or customer of Employer during the course of Employee's employment with Employer, nor shall Employee do any work for or contract with any client or customer who was a client or customer of Employer during the course of Employee's employment with Employer.

    3.2 During employment with Employer, and for a period of twelve (12) months

afterwards, Employee will not solicit, entice or persuade any other Employee or Employee of Employer's clients or customers to leave the services of their Employer for any reason.

3.3 Employee agrees that the foregoing restrictions are fair and reasonable considering the scope of Employee's employment, salary and benefits provided by Employer and Employee further agrees that such restrictions will not unduly restrict or prohibit Employee from obtaining gainful employment in his or her chosen profession.

4. <u>Ownership</u>. Employee agrees that all developments made and works created by Employee or under Employee's direction in connection with Employer's assignments or in connection with the assignments of other Employees of Employer and whether or not made exclusively at Employer's premises and whether or not created exclusively with Employer's computers or other equipment, shall be the sole and complete property of Employer and that all title, ownership, copyrights and other proprietary interest therein shall belong to Employer and that all other provision of this Agreement shall fully apply to all such developments and works created by Employee shall be considered "works made for hire" pursuant to Federal Copyright Law and Employee assigns to Employer the ownership and title to all such materials and copyrights on such materials.

5. <u>Injunctive Relief</u>. Employee acknowledges that disclosure of any Trade Secrets or disclosure of any Confidential Information or any breach of any noncompetitive covenants or agreements contained herein will give rise to irreparable injury to Employer or clients of Employer, inadequately compensable in damages. Accordingly, Employer or, where appropriate, a client of Employer, may seek and obtain injunctive relief against the breach or threatened breach of the foregoing undertakings, in addition to any other legal remedies which may be available. The Employee further acknowledges and agrees that in the event of the termination of employment with Employer, the Employee's experience and capabilities are such that the Employee can obtain employment in business activities as an Employee of Employer, and that enforcement of a remedy hereunder by way of injunction shall not prevent the Employee from earning a reasonable livelihood. The Employee further acknowledges and agrees that covenants contained herein are necessary for the protection of Employer's legitimate business interests and are reasonable in scope and content.

6. <u>Miscellaneous</u>.

6.1 This Agreement shall inure to the benefit of and be binding upon, Employer and its subsidiaries and affiliates, together with their successors and assigns, and Employee, together with Employee's executor, administrator, personal representative, heirs and legatees.

6.2 This Agreement merges and supersedes all prior and contemporaneous Agreements, undertaking, covenants or conditions (including specifically all prior confidentiality and non-competition agreements Employee has entered into with Employer), whether oral or written, express or implied, to the extent they contradict and conflict with the provisions hereof.

6.3 This Agreement is non-assignable by Employee.

IManage:1423005.1

6.4 The failure of Employer to enforce any rights granted hereunder or take any action against Employee in the event of any breach of this Agreement shall not be deemed a waiver to any subsequent rights or actions in the event of future breaches.

6.5 If any provision of this Agreement is determined to be invalid or unenforceable by a decision of a Court of competent jurisdiction, it shall not affect the remainder of the Agreement which shall survive and remain in full force and effect.

6.6 All obligations of Employee relating to ownership of work products and protection of trade secrets and confidential information shall survive the termination of this Agreement.

7. <u>Applicable Law</u>. This Agreement shall be constructed in accordance with the Laws of the State of New York.

8. Employee is specifically not authorized to execute any agreement or contract in behalf of Employer unless specifically authorized to do so, in writing, by Robert Zeide. Employee further agrees to indemnify and hold harmless Employer from any and all damages, including reasonable attorney's fees, incurred by Employer as a result of a breach of this Section.

IN WITNESS WHEREOF, the parties have executed this Agreement under Seal as of the _5_ day of _SEPT 2006_

ACCEPTED BY EMPLOYEE:

By: _Kathleen E Rollans_    Date: _9/5/06_

Social Security Number: _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_

Address: 1572 Penyork Ave.
Titusville, FL 32796

ACCEPTED BY EMPLOYER, _PCC_

By: _Mitchell Kaipman_    Date: _9/5/06_

# EXHIBIT B

PCI MEDICAL SUPPLY

## EMPLOYEE NON-DISCLOSURE AND
## PROPRIETARY RIGHTS AGREEMENT

In consideration of employment with PCI Medical Supply, located at 120 Apollo Street, Brooklyn, New York 11222, (hereinafter referred to as "Employer"), the undersigned Employee, _Sara St. Marie_, hereby covenants and agrees as follows:

1. Avoidance of Conflict of Interest. While employed by Employer, Employee will not engage in any other business activity which conflicts with Employee's duties to Employer. Under no circumstances will Employee work for any competitor or have any financial interest in any competitor of Employer; provided, however, that this Agreement does not prohibit investment of a reasonable part of Employee's assets in the stock or securities of any competitor whose stock or securities are publicly traded.

2. Confidentiality.

2.1 Employee recognizes and acknowledged that the systems and software which Employer owns, plans or develops, or acquires from third parties, whether for its own use or for use by its clients, are developed as a result of an expenditure of time and expense, are confidential in nature and are the trade secrets, proprietary to and the property of the Employer. Employee further recognizes and acknowledges that in order to enable Employer to perform services for its clients, such clients may furnish to Employer confidential information concerning their business affairs, property, methods of operation or other data and that the good will afforded to Employer depends upon, among other things, Employer and its Employees keeping such services and information confidential.

2.2 For the purposes of this Agreement, a "Trade Secret" is any scientific or technical information, design, process, procedure, formula or improvement that is valuable and not generally known to competitors of Employer including but not limited to computer software programs. Examples are the specialized information and technology relating to Employer's business. "Confidential Information" is any data or information, other than Trade Secrets, that is competitively sensitive, and not generally known to the public, including but not limited to Employer's customer lists, prospect list, suppliers list, trading manuals, product development plans, pricing information, marketing strategies, catalog designs, packaging designs, rebate information with vendors, and internal performance statistics.

2.3 Employee shall not, for the duration of this Agreement, nor any time thereafter, without the proper written consent of Employer, use or disclose any trade secret or confidential

IManage:1423005.1

information of Employer of its clients to its clients or any third parties, or permit or cause any personal organization:

(a) to copy or duplicate any physical form of Employer's trade secrets or confidential information to or from any medium except for archival, security or other regular business purposes; or

(b) create or recreate, or attempt to create or recreate, the source programs, object code or any other aspect of the trade secrets of confidential information of Employer, in all or in part; or

(c) to place such trade secrets into the public domain.

2.4 Employee shall limit access to all media containing Employer's and or its client's trade secrets or confidential information to its employees and agents necessary to permit Employee to perform tasks required pursuant to the Agreement. Employee further agrees to store all media and documentation upon which Employer's and or its clients' trade secrets and confidential information are recorded in a secure place, except when being used, and will exercise all other reasonable precautions to prevent unauthorized access, whether direct or indirect. Employee agrees that he/she shall not disclose, transfer, use, copy or allow any such trade secrets of confidential information to any employees or third parties.

2.5 Upon the request of Employer and, in any event, upon the termination of Employee's employment, Employee will leave with the Employer and/or its clients all computer programs, documentation, code, memoranda, notes, records, drawings, manuals, flow charts, or other documents pertaining to Employer's business or Employee's employment (including all copies thereof). Employee will also leave with Employer and or its client's all materials involving any Trade Secrets of Confidential Information of Employer or Employer's clients.

2.6 During the course of employment, Employee agrees to treat all Trade Secrets and Confidential Information of Employer and its clients as confidential and to take all necessary precautions against disclosure of such information to third parties during and after the terms of this Agreement.

3. Restrictions on Solicitation.

3.1 Employee further agrees that during the term of this Agreement, and for a period of twelve (12) months thereafter, Employee shall not attempt to sell any competing goods or services to any client or customer who was a client or customer of Employer during the course of Employee's employment with Employer, nor shall Employee do any work for or contract with any client or customer who was a client or customer of Employer during the course of Employee's employment with Employer.

3.2 During employment with Employer, and for a period of twelve (12) months

afterwards, Employee will not solicit, entice or persuade any other Employee or Employee of Employer's clients or customers to leave the services of their Employer for any reason.

3.3 Employee agrees that the foregoing restrictions are fair and reasonable considering the scope of Employee's employment, salary and benefits provided by Employer and Employee further agrees that such restrictions will not unduly restrict or prohibit Employee from obtaining gainful employment in his or her chosen profession.

4. <u>Ownership</u>. Employee agrees that all developments made and works created by Employee or under Employee's direction in connection with Employer's assignments or in connection with the assignments of other Employees of Employer whether or not made exclusively at Employer's premises and whether or not created exclusively with Employer's computers or other equipment, shall be the sole and complete property of Employer and that all title, ownership, copyrights and other proprietary interest therein shall belong to Employer and that all other provision of this Agreement shall fully apply to all such developments and works created by Employee shall be considered "works made for hire" pursuant to Federal Copyright Law and Employee assigns to Employer the ownership and title to all such materials and copyrights on such materials.

5. <u>Injunctive Relief</u>. Employee acknowledges that disclosure of any Trade Secrets or disclosure of any Confidential Information or any breach of any noncompetitive covenants or agreements contained herein will give rise to irreparable injury to Employer or clients of Employer, inadequately compensable in damages. Accordingly, Employer or, where appropriate, a client of Employer, may seek and obtain injunctive relief against the breach or threatened breach of the foregoing undertakings, in addition to any other legal remedies which may be available. The Employee further acknowledges and agrees that in the event of the termination of employment with Employer, the Employee's experience and capabilities are such that the Employee can obtain employment in business activities as an Employee of Employer, and that enforcement of a remedy hereunder by way of injunction shall not prevent the Employee from earning a reasonable livelihood. The Employee further acknowledges and agrees that covenants contained herein are necessary for the protection of Employer's legitimate business interests and are reasonable in scope and content.

6. <u>Miscellaneous</u>.

6.1 This Agreement shall inure to the benefit of and be binding upon, Employer and its subsidiaries and affiliates, together with their successors and assigns, and Employee, together with Employee's executor, administrator, personal representative, heirs and legatees.

6.2 This Agreement merges and supersedes all prior and contemporaneous Agreements, undertaking, covenants or conditions (including specifically all prior confidentiality and non-competition agreements Employee has entered into with Employer), whether oral or written, express or implied, to the extent they contradict and conflict with the provisions hereof.

6.3 This Agreement is non-assignable by Employee.

6.4 The failure of Employer to enforce any rights granted hereunder or take any action against Employee in the event of any breach of this Agreement shall not be deemed a waiver to any subsequent rights or actions in the event of future breaches.

6.5 If any provision of this Agreement is determined to be invalid or unenforceable by a decision of a Court of competent jurisdiction, it shall not affect the remainder of the Agreement which shall survive and remain in full force and effect.

6.6 All obligations of Employee relating to ownership of work products and protection of trade secrets and confidential information shall survive the termination of this Agreement.

7. Applicable Law. This Agreement shall be constructed in accordance with the Laws of the State of New York.

8. Employee is specifically not authorized to execute any agreement or contract in behalf of Employer unless specifically authorized to do so, in writing, by Robert Zeide. Employee further agrees to indemnify and hold harmless Employer from any and all damages, including reasonable attorney's fees, incurred by Employer as a result of a breach of this Section.

IN WITNESS WHEREOF, the parties have executed this Agreement under Seal as of the 13th day of Oct.

ACCEPTED BY EMPLOYEE

By: _____        Date: 10/13/68

Social Security Number: 046788239

Address: 108 Habor Dr. Unit 119
Stanford, CT 06902

ACCEPTED BY EMPLOYER,

By: _____        Date 10/13/08

JManage:1423005.1

EXHIBIT C



ATTORNEYS AND COUNSELORS

Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, Idaho 83701-1617
208.344.6000
www.hawleytroxell.com

STEVEN W. BERENTER
ADMITTED TO PRACTICE LAW IN IDAHO
EMAIL: SBERENTER@HAWLEYTROXELL.COM
DIRECT DIAL: 208.388.4833
DIRECT FAX: 208.954.5204

March 25, 2013

**VIA FEDERAL EXPRESS**

Robert Mims
Merritt Veterinary Supply
P. O. Box 9829
1520 Pineview Road
Columbia, SC  29209

      Re:    *MWI Veterinary Supply Co.*

Dear Mr. Mims:

      This law firm represents MWI Veterinary Supply Co. ("MWI" or "Company").  It is our understanding that Merritt Veterinary Supply ("Merritt") has recently hired three individuals who just recently resigned from their employment with MWI as well as two other individuals who had been associated with the Company.  It thus appears that Merritt may be targeting MWI's employees as part of its hiring strategy.  In any event, this letter should serve as notice that it is MWI's expectation that Merritt will not interfere with MWI's employees or former employees' obligations to MWI nor will it otherwise engage in wrongful conduct or anti-competitive activities in recruiting the Company's employees.  To the extent that Merritt does so, MWI will not hesitate to seek legal recourse for such conduct.

      To further expand on MWI's concerns in this regard, we are advised that Merritt has hired Kathleen Rotanz, Sara St. Marie and Corey Randell, all of whom recently left their employment with MWI.  Please be advised that Ms. Rotanz and Ms. St. Marie are parties to an Employee Non-Disclosure and Proprietary Rights Agreement ("Agreement") with PCI Medical Supply ("PCI").[1]  When MWI acquired PCI, it purchased these Agreements as an asset and thus

---

[1]    We are enclosing a copy of correspondence from this office to Ms. Rotanz and Ms. St. Marie, the purpose of which is to ensure that neither individual violates her Agreement with MWI.

40294.0007.5688819.1

Robert Mims
Merritt Veterinary Supply
March 25, 2013
Page 2

they remain in full force and effect.  Sections 2 and 3 of the Agreement are of particular significance.  Section 2 provides that these employees will not at any time use or disclose any MWI (or PCI) trade secrets or confidential information as those terms are defined in the Agreement.  Further, pursuant to Section 2, they have agreed that they will not (i) allow any such information to be copied or duplicated; (ii) create or recreate source programs, object codes or any other aspect of such information; or (iii) place any such information in the public domain.  There is no durational limitation with respect to their obligations under Section 2 and they remain in full force and effect subsequent to the employee's separation of employment with MWI.

Of equal importance, Section 3 provides in relevant part:

> 3.1    Employee further agrees that during the term of this Agreement and for a period of 12 months thereafter, Employee shall not attempt to sell any competing goods or services to any client or customer who was a client or customer of Employer during the course of Employee's employment with Employer, nor shall Employee do any work for or contract with any client or customer who was a client or customer of Employer during the course of Employee's employment with Employer.

> 3.2    During employment with Employer, and for a period of 12 months afterwards, Employee will not solicit, entice or persuade any other Employee of Employer's clients or customers to leave the services of their Employer for any reason.

The obligations set forth in Section 3 remain in full force and effect for a 12-month period subsequent to these employees' separation of employment with MWI.[2]

There is no question that these individuals must comply with their Agreements.  They both received adequate consideration for their execution of the Agreement, the terms of the Agreement are reasonable and were freely negotiated and agreed to by these individuals and the Agreements are enforceable in the jurisdictions in which they are used and applied.  Thus, any attempt by Merritt or its employees to interfere with MWI's employees and former employees'

---

[2]    Please note that other former employees of PCI who are now employed by MWI may be parties to similar agreements.  Moreover, Mr. Randell is a party to such an agreement.  However, MWI has released Mr. Randell from Section 3 of his agreement.  Section 2 of his agreement remains in full force and effect.

Robert Mims
Merritt Veterinary Supply
March 25, 2013
Page 3

fulfillment of their obligations contained in these Agreements may constitute tortious interference with MWI's rights and could give rise to legal liability. We therefore must caution Merritt against participating in any conduct which may result in these employees violating their Agreements with MWI.

In addition, to the extent that Merritt may be "poaching" MWI's employees, its actions may, without regard to any such agreements, still give rise to liability. For example, should Merritt disparage MWI or otherwise engage in wrongful conduct in its pursuit of MWI's employees, such conduct could give rise to claims of tortious interference with MWI's relationships with its employees. It thus behooves Merritt to refrain from engaging in any such conduct. Should it do so, just as MWI will not hesitate to enforce its agreements, it will not hesitate to seek damages for Merritt's wrongful conduct.

Based on the circumstances presented here, MWI necessarily must demand that within 14 days of its receipt of this letter, Merritt provide MWI written assurances that: (a) Ms. Rotanz and Ms. St. Marie, are, have been and will continue to fully and completely comply with all of their obligations to MWI; (b) Merritt will not interfere with Ms. Rotanz's and Ms. St. Marie's obligations to MWI; (c) Merritt will honor and respect and will not in any way interfere with any other MWI employees or former MWI employees' obligations to MWI; and (d) to the extent that Merritt recruits any other MWI employees, it will not engage in any wrongful conduct in doing so, it will not tortiously interfere with MWI's contracts with these employees nor will it otherwise tortiously interfere with MWI's relationships with these employees.

Finally, we must demand on MWI's behalf that Merritt and all persons or entities within its control or supervision and all persons or entities acting in concert with Merritt or on its behalf, maintain, preserve and protect any documents, electronically stored information, software and other items that it knows or reasonably should know, are relevant to MWI's rights, as set forth herein, MWI's employees or former employees' breach of those rights and/or Merritt's interference with the same. This obligation extends, but is not limited to, any electronic, documentary or other information stored in any area under Merritt's control, and/or on any computer disks, hard drives, servers and/or any other electronic storage devices to which Merritt has access. This obligation also applies to all communications stored at any web-based email or instant message service to which Merritt subscribes.

Merritt should, therefore, immediately suspend any software application, process, practice or procedure that might destroy, purge, erase, delete or alter any document, information, or other evidence, including that which is store electronically, that is or may be relevant to any communications or dealings in connection with this matter. This includes, but is not limited to, any routine process, practice or procedure that might lead to overwriting (automatic or

40294.0007.5688819.1

Robert Mims
Merritt Veterinary Supply
March 25, 2013
Page 4

otherwise), reformatting or purging of information stored in electronic formats, such as computer disks, hard drives, servers, back-up tapes and any other electronic storage devices.

In sum, please be advised that MWI considers this a very serious matter. While MWI is not anxious for a dispute, it cannot stand idly by while Merritt or any other competitor engages in improper means to interfere with its sales force and the relationships it has developed with its employees and customers. We thus urge you to give MWI's concerns your prompt attention and trust that Merritt will conduct itself accordingly.

Sincerely,

HAWLEY TROXELL ENNIS & HAWLEY LLP

Steven W. Berenter

SWB:tsul
cc:     Client

# EXHIBIT D

# Borges & Associates, LLC

## Attorneys at Law

<u>**WANDA BORGES**</u>

CHRISTINE J. HANSEN
THOMAS MOYHER
CRISTINA LIPAN

575 Underhill Blvd.
Syosset, New York  11791
Tel: 1-516-677-8200
Fax: 1-516-677-0806
wborges@borgeslawllc.com

SPECIAL COUNSEL
LABOR and EMPLOYMENT LAW

**RICHARD V. RAPPAPORT**

April 5, 2013

Steven W. Berenter, Esq.
Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P. O. Box 1617
Boise, Idaho 83701-1617

*Re:   Merritt Veterinary Supply, Inc.*
*With:  MWI Veterinary Supply Co*

Dear Mr. Berenter:

Please be advised that Borges & Associates, LLC. represents Merritt Veterinary Supply, Inc. ("Merritt") in connection with your correspondence dated March 25, 2013 directed to Robert Mims and the allegations contained therein. Merritt denies the contentions contained in your correspondence regarding any wrongful activity on the part of Merritt.

You allege that an Employee Non-Disclosure and Proprietary Rights Agreement "(Agreement)" should not be interfered with by Merritt. It is Merritt's position that they have neither interfered with any legitimate Agreement nor targeted MWI's employees as part of its hiring strategy. Nothing could be further from the truth.

We have obtained and reviewed a copy of the Agreement. Section 2 of said Agreement refers to the use of trade secrets or confidential information. The Agreement provides, as summarized by you in your correspondence: that the employee will not (1) allow any such information to be copied or duplicated; (2) create or recreate source programs, object codes or any other aspect of such information; or (3) place any such information in a public domain.

Merritt has not received any MWI (or PCI) trade secrets or confidential information from any of its employees, specifically, Kathleen Rotanz, Sara St. Marie and Corey Randell. These employees are sales personnel for Merritt, and to the best of Merritt's knowledge were sales personnel for PCI (and for a short period of time MWI) They are not employed in unique or extraordinary positions and Merritt has no belief that any of these employees were ever in possession of any trade secrets or confidential information. There are no confidential customer lists. In this Veterinarian Pharmaceutical industry information as to veterinarian operations is readily available from various sources, including the internet, rather than from any secret customer lists.

**Borges & Associates, LLC.**
**April 5, 2013**

**Steven W. Berenter, Esq.**
**Page 2**

Under New York law a trade secret is any formula, patent, device or compilation of information which one uses in his business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. Facts taken into consideration in determining whether information constitutes a trade secret include

(1)     The extent to which the information is known outside the business;

(2)     The extent to which it is known by employees and others involved in the business;

(3)     The extent of measures taken by the business to guard the secrecy of the information;

(4)     The value of the information to the business and its competitors;

(5)     The amount of effort or money expended by the business and its competitors; and

(6)     The ease or difficulty with which the information could be properly acquired or duplicated by others. *Ashland Management v. Janien. 82 N.Y.2d 395 (1993)* Based on these factors, there are no protectable trade secrets.

In *Sasqua Group, Inc. v. Courtney, 2010 WL 3613855 (E.D.N.Y. Aug. 2, 2010)*, an executive search consulting firm specializing in the recruitment and placement of professionals in the financial services industry brought suit against a former employee claiming misappropriation of trade secrets. The Eastern District of New York held that although employer's customer list may have been a trade secret years ago, "the exponential proliferation of information made available for full-blown use of the Internet and the powerful tools it provides to access such information is a very different story."

The defendant testified that "virtually all personnel in the capital markets industry ... have their contact information on Bloomberg, LinkedIn, Facebook or other publicly available databases." Moreover, she argued, "the contact information that a search firm may assemble in a database is almost immediately obsolete." This is clearly applicable here.

While we presently represent Merritt and not the individual employees, it is our opinion that the non-compete clause is not reasonable in time and area. The time of 12 months is too broad and the geographic area is unlimited. This is unduly burdensome to the employees, results in an undue hardship on the employees and is against public policy because enforcement of this Agreement would prevent the employees from earning a livelihood.

**Borges & Associates, LLC.**
**April 5, 2013**

**Steven W. Berenter, Esq.**
**Page 3**

In your letter, you refer to the employees receiving adequate consideration for their execution of the agreement which is also patently incorrect. We are informed that no consideration at all was given to the employees for their execution of the Agreements. These Agreements were not freely negotiated and agreed to by the individuals. We have been informed that the former employees of PCI .were coerced into signing the Agreements or they would be terminated from employment.

New York has long protected the ability of its citizens to earn a livelihood by whatever skills they have developed through hard work and determination. These non-compete clauses have the effect of restraining persons from using those skills acquired over the years in earning a living. Non-compete clauses also deprive employees of using their unique skills and hard work as leverage in negotiating raises and promotions. If employers are able to restrain their employees' ability to work for a competitor in the same field, their employees can no longer effectively be paid commensurate with their value.

In the case of *Eyes of the World, Inc. v. Boci, Civ. Ct of the City of NY, August 19, 2011*, a New York Court recently held that a former employee's restrictive covenants (non-compete agreement) prohibiting her from providing services to any client of her former employer was overly broad and thus the provision was unenforceable.

When defendant Boci voluntarily resigned from her position and began working for a competitor, plaintiff sought to enforce the non-compete agreement which had a one-year provision.

The court stated that

*In order to be enforceable, an anticompetitive covenant ancillary to an employment agreement must be reasonable in time and area, necessary to protect the employer's legitimate interest, not harmful to the public, and not unreasonably burdensome to the employee ... Restrictive covenants are generally frowned upon by courts due to public policy considerations that seek to prevent restrictions on a person's livelihood ... Consequently these covenants will be enforced only if reasonably limited temporally and geographically and then only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists, or if the employee's services are unique or extraordinary.*

While Merritt does not intend to interfere with what you construe may constitute tortious interference with MWI's rights. These alleged rights arise out of unenforceable contractual provisions. Your demands requiring that Merritt provide certain written assurances are not only inappropriate but also originate from the same unenforceable provisions as does your insistence

**Borges & Associates, LLC.**
**April 5, 2013**

**Steven W. Berenter, Esq.**
**Page 4**

that Merritt maintains and preserve enumerated documents and electronically stored information. Your demand concerning immediately suspending any described software application practice or procedure is also inappropriate and also originates from the same unenforceable provision. Nevertheless, Merritt has no such data, documentation or information as referenced in Section 2 of the Agreement. Furthermore, Merritt has not, nor does it intend to poach any PCI employees.

The elements of a claim for tortious interference with a contract are: (1) a valid contract between plaintiff and the third party, (2) defendant's knowledge of the contract, (3) defendant's unjustified deliberate inducement of the third party's breach of the contract, (4) actual breach of the contract and (5) damages resulting from the breach, *Sony Music Entertainment, Inc. v. Werre, 26 Misc. 3d 1240(A), (2010).* These elements are not present in the instant case.

Where there has been no breach of an existing contract … a cause of action for tortious interference with contract would not lie, *Bajan Group, Inc. v. Consumers Interstate Corp. 28 Misc 3d 1227(A) (2010).* Moreover, if the new employer had no knowledge of the existing non-compete agreement when it hired the employee, the new employer will not be liable for tortious interference with contractual relations, *Delfino Insulation Co., Inc. v. Jaworowski, 55 A.D. 3d 654, (2008).*

The defenses by the new employer to a tortious interference claim typically include: (1) the new employer was unaware of the non-compete agreement; (2) the non-compete agreement is not enforceable; and/or (3) the new employer was justified in hiring and continuing to employ the individual in question. These defenses are all applicable in the instant case.

The employer has defenses in that Merritt was unaware of the specific non-compete agreement although it may have been aware that some contract was in existence with PCI. The non-compete agreement is not enforceable and Merritt was therefore justified in hiring and continuing to employee the individuals in question.

Merritt considers these to be very serious allegations. If necessary, Merritt will defend such unfounded claims to the full extent of the law. Kindly contact the undersigned if you wish to discuss this matter further.

Sincerely,

*Wanda Borges*
WANDA BORGES

# EXHIBIT E



## HAWLEY TROXELL

**ATTORNEYS AND COUNSELORS**

Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, Idaho 83701-1617
208.344.6000
www.hawleytroxell.com

STEVEN W. BERENTER
ADMITTED TO PRACTICE LAW IN IDAHO
EMAIL: SBERENTER@HAWLEYTROXELL.COM
DIRECT DIAL: 208.388.4833
DIRECT FAX: 208.954.5204

March 25, 2013

**CERTIFIED MAIL | RETURN RECEIPT
AND VIA FEDERAL EXPRESS**

Kathleen Rotanz
15772 Pentax Avenue
Titusville, FL  32796

   Re: *MWI Veterinary Supply Co.*

Dear Ms. Rotanz:

   As you know, this law firm represents MWI Veterinary Supply Co. ("MWI" or "Company"). I write in follow-up to my letter to you dated March 4, 2013, regarding your continuing obligations under your Employee Non-Disclosure and Proprietary Rights Agreement ("Agreement") with PCI Medical Supply ("PCI"). As we have advised, this Agreement remains in full force and effect notwithstanding your separation of employment with MWI. We now find it necessary to address issues related to your new employment to ensure that you are not in violation of your Agreement.

   While we discussed at some length the limitations to which you have agreed in our initial letter to you, perhaps it would be helpful to revisit the provisions of your Agreement which are of particular significance. Section 2 provides that you will not at any time use or disclose any MWI (or PCI) trade secrets or confidential information as those terms are defined in the Agreement. Further, pursuant to Section 2, you have agreed that you will not (i) allow any such information to be copied or duplicated; (ii) create or recreate source programs, object codes or any other aspect of such information; or (iii) place any such information in the public domain. There is no durational limitation with respect to your obligations under Section 2 and they remain in full force and effect subsequent to your separation of employment with MWI.

Kathleen Rotanz
March 25, 2013
Page 2


Of equal importance, Section 3 provides in relevant part:

>       3.1     Employee further agrees that during the term of this
> Agreement and for a period of 12 months thereafter, Employee
> shall not attempt to sell any competing goods or services to any
> client or customer who was a client or customer of Employer
> during the course of Employee's employment with Employer, nor
> shall Employee do any work for or contract with any client or
> customer who was a client or customer of Employer during the
> course of Employee's employment with Employer.

>       3.2     During employment with Employer, and for a
> period of 12 months afterwards, Employee will not solicit, entice
> or persuade any other Employee of Employer's clients or
> customers to leave the services of their Employer for any reason.

The obligations set forth in Section 3 remain in full force and effect for a 12-month period
subsequent to your separation of employment with MWI.

It is our understanding that you have recently been employed by Merritt Veterinary
Supply ("Merritt") as a joint inside/outside sales representative. Because Merritt is a competitor
of MWI, we necessarily must take steps on behalf of the Company to ensure that you are not
violating the above-referenced provisions of your Agreement. Accordingly, we hereby demand
that within 10 days of your receipt of this letter, you provide MWI with written assurances that
(a) you are not using or disclosing any of MWI's trade secrets or confidential information; (b) for
a period of 12 months after the date of the separation of your employment with MWI, you will
not attempt to sell any competing goods or services to any client or customer who was a client or
customer of MWI (or for that matter PCI) during the course of your employment with either of
those companies; and (c) for the same 12-month period, you will not solicit, entice or persuade
any employee of MWI to leave MWI. We also hereby demand that you describe with specificity
those steps that are being taken to ensure that you are in compliance with these obligations.

As we advised in our initial correspondence to you, the purpose and intent of these
sections of your Agreement are of critical importance to MWI. Thus, MWI expects that you will
fully comply with the covenants contained therein. Should you fail to do so, MWI will not
hesitate to seek legal recourse for any violations of this Agreement.

Further, you should be advised that we are providing a copy of this letter to Merritt so
that it too has a clear understanding of the limitations to which you have agreed. We are also
putting Merritt on notice that it is MWI's expectation that it will not interfere with your

Kathleen Rotanz
March 25, 2013
Page 3


obligations to the Company and that in fact, it will take steps to make sure that you are in compliance with your Agreement.

       Thank you for your attention to these matters.

                         Sincerely,

                         HAWLEY TROXELL ENNIS & HAWLEY LLP

                         Steven W. Berenter

SWB:tsul
cc:     Client
          Merritt Veterinary Supply

EXHIBIT F



**ATTORNEYS AND COUNSELORS**

Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, Idaho 83701-1617
208.344.6000
www.hawleytroxell.com

STEVEN W. BERENTER
ADMITTED TO PRACTICE LAW IN IDAHO
EMAIL: SBERENTER@HAWLEYTROXELL.COM
DIRECT DIAL: 208.388.4833
DIRECT FAX: 208.954.5204

March 25, 2013

**CERTIFIED MAIL | RETURN RECEIPT**
**AND VIA FEDERAL EXPRESS**

Sara St. Marie
150 Barker Road
Lebanon, CT  06249

   Re: *MWI Veterinary Supply Co.*

Dear Ms. St. Marie:

   As you know, this law firm represents MWI Veterinary Supply Co. ("MWI" or "Company"). I write in follow-up to my letter to you dated March 4, 2013, regarding your continuing obligations under your Employee Non-Disclosure and Proprietary Rights Agreement ("Agreement") with PCI Medical Supply ("PCI"). As we have advised, this Agreement remains in full force and effect notwithstanding your separation of employment with MWI. We now find it necessary to address issues related to your new employment to ensure that you are not in violation of your Agreement.

   While we discussed at some length the limitations to which you have agreed in our initial letter to you, perhaps it would be helpful to revisit the provisions of your Agreement which are of particular significance. Section 2 provides that you will not at any time use or disclose any MWI (or PCI) trade secrets or confidential information as those terms are defined in the Agreement. Further, pursuant to Section 2, you have agreed that you will not (i) allow any such information to be copied or duplicated; (ii) create or recreate source programs, object codes or any other aspect of such information; or (iii) place any such information in the public domain. There is no durational limitation with respect to your obligations under Section 2 and they remain in full force and effect subsequent to your separation of employment with MWI.

Sarah St. Marie
March 25, 2013
Page 2

Of equal importance, Section 3 provides in relevant part:

> 3.1    Employee further agrees that during the term of this Agreement and for a period of 12 months thereafter, Employee shall not attempt to sell any competing goods or services to any client or customer who was a client or customer of Employer during the course of Employee's employment with Employer, nor shall Employee do any work for or contract with any client or customer who was a client or customer of Employer during the course of Employee's employment with Employer.

> 3.2    During employment with Employer, and for a period of 12 months afterwards, Employee will not solicit, entice or persuade any other Employee of Employer's clients or customers to leave the services of their Employer for any reason.

The obligations set forth in Section 3 remain in full force and effect for a 12-month period subsequent to your separation of employment with MWI.

It is our understanding that you have recently been employed by Merritt Veterinary Supply ("Merritt") as a joint inside/outside sales representative. Because Merritt is a competitor of MWI, we necessarily must take steps on behalf of the Company to ensure that you are not violating the above-referenced provisions of your Agreement. Accordingly, we hereby demand that within 10 days of your receipt of this letter, you provide MWI with written assurances that (a) you are not using or disclosing any of MWI's trade secrets or confidential information; (b) for a period of 12 months after the date of the separation of your employment with MWI, you will not attempt to sell any competing goods or services to any client or customer who was a client or customer of MWI (or for that matter PCI) during the course of your employment with either of those companies; and (c) for the same 12-month period, you will not solicit, entice or persuade any employee of MWI to leave MWI. We also hereby demand that you describe with specificity those steps that are being taken to ensure that you are in compliance with these obligations.

As we advised in our initial correspondence to you, the purpose and intent of these sections of your Agreement are of critical importance to MWI. Thus, MWI expects that you will fully comply with the covenants contained therein. Should you fail to do so, MWI will not hesitate to seek legal recourse for any violations of this Agreement.

Further, you should be advised that we are providing a copy of this letter to Merritt so that it too has a clear understanding of the limitations to which you have agreed. We are also putting Merritt on notice that it is MWI's expectation that it will not interfere with your

Sarah St. Marie
March 25, 2013
Page 3

obligations to the Company and that in fact, it will take steps to make sure that you are in compliance with your Agreement.

Thank you for your attention to these matters.

Sincerely,

HAWLEY TROXELL ENNIS & HAWLEY LLP

Steven W. Berenter

SWB:tsul
cc:      Client
         Merritt Veterinary Supply

40294.0007.5696393.1